**SO ORDERED.**

**SIGNED this 12 day of November, 2013.**



_____

**James D. Walker, Jr.**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | CASE NO. 12-52521-JDW |
| HAROLD WILLIAMS, | ) | |
| | ) | |
| DEBTOR. | ) | |
| | ) | |
| SHARON WILLIAMS, | ) | ADVERSARY PROCEEDING |
| | ) | NO. 13-5010 |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| HAROLD WILLIAMS, | ) | |
| | ) | |
| DEFENDANT. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

COUNSEL

For Plaintiff:   Alan I. Seitman
                 6445 Powers Ferry Road, Suite 265
                 Atlanta, Georgia 30339

For Debtor:      Valentia Patrice Alleyne
                 2625 Piedmont Road, Suite 56-327
                 Atlanta, Georgia 30324

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff's complaint objecting to discharge and requesting determination of the dischargeability of a debt. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(I) and (J). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

## Background

Debtor Harold Williams is a 69-year-old former truck driver with an 11th grade education. He filed a Chapter 7 petition on September 4, 2012. He listed his sister Sharon Williams ("Plaintiff") as an unsecured creditor with a claim in the amount of $78,145,[1] the result of a judgment she obtained in state court.[2] On October 10, 2012, the Chapter 7 Trustee conducted the § 341(a) meeting of creditors and filed a report of no assets. A 2004 examination of Debtor was held on February 5, 2013, at the office of Plaintiff's counsel. On February 8, 2013, Plaintiff filed a complaint objecting to discharge and for a determination that her debt is nondischargeable; the complaint was timely filed pursuant to an order extending the bar date. On June 26, 2013, Debtor filed amended schedules, an amended statement of financial affairs, and an amended means test. The Court held a trial on the complaint on September 18-19, 2013.

---

[1] Debtor listed unsecured debts in the total amount of $124,884. Therefore, Plaintiff's debt constitutes 63% of unsecured debts. (Amended Schedule F and Amended Summary of Schedules, Dkt. No. 12.)

[2] On December 3, 2012, the Court entered an order providing for the avoidance of Plaintiff's judicial lien to the extent the lien impairs Debtor's exemptions, effective upon entry of a discharge. (Dkt. No. 26.)

3

Debtor filed further amendments to Schedules B and C on November 2, 2013. Based on the

evidence presented at trial and the legal authorities, the Court concludes Debtor is not entitled to

a discharge under 11 U.S.C. § 727(a)(4)(A).

**Findings of Fact**

Worker's Compensation Claim

Debtor stopped working as a truck driver in 2003 due to a back injury. As a result, he

filed a worker's compensation claim, which was not settled until 2010. Debtor received a

settlement of $24,999 less legal fees of $4,000 for a net of $20,999. The exact date that Debtor

received the proceeds is not in the record. However, Debtor signed the settlement statement on

December 3, 2010. (Plaintiff's Exhibit 13, p.2.) Debtor did not list the settlement proceeds on his

original statement of financial affairs ("SOFA"), but he did list the proceeds on his amended

SOFA.

Divorce From Frankie Williams

Debtor was previously married to Frankie Williams, whom he divorced in April 2009.

The divorce decree awarded Debtor full interest in real property in Smyrna, Georgia (the

"Smyrna" house), and Fort Wayne, Indiana (the "South Anthony Boulevard" house). The decree

awarded Debtor one half of Frankie's interest in real property in Lima, Ohio (the "Crestwood

Drive" house). The decree identified three other parcels of Ohio real property linked to Frankie

(the "Collins Avenue" house, the "West Elm" house, and the "Van Wert" house). The divorce

court could not determine whether Frankie retained an interest in the properties, but granted

Debtor half of any interest held by Frankie. Debtor was later able to establish Frankie had an

interest in the Collins Avenue property, but the West Elm and Van Wert properties remain in

4

question. The divorce decree further awarded Debtor $56,000 in property division payable by

June 3, 2009, $10,000 for personal property payable by June 3, 2009, and alimony of $1,000 a

month for 24 months starting on June 1, 2009.

Debtor sold the South Anthony Boulevard house back to Frankie in January 2010 for

$50,000. He sold his interest in the Collins Avenue property in August 2011 for $8,128.90.

Debtor did not list either transaction on his original SOFA, but he did list them on his amended

SOFA.

Frankie sold the Crestwood Drive house without Debtor's permission. As a result, in

February 2010, the Cobb County Superior Court held her in contempt and ordered her to pay

Debtor $15,000 at the rate of $500 per month for 30 months beginning March 2010. Debtor

received most of the contempt award during 2010, 2011, and 2012. A portion of the award,

approximately $1,500, remained due on the petition date. Debtor testified that he received the

$66,000 property settlement in 2009. He also received all the alimony. Frankie paid Debtor by

certified checks. Debtor deposited some of the checks into his bank account and cashed other

checks. He could not recall how he spent the cash, other than to purchase groceries and gas.

Debtor failed to list on his original SOFA any alimony and contempt proceeds he

received from Frankie between 2010 and the petition date; he failed to list contempt proceeds

still due to him on Schedule B and Schedule I, and he failed to list on the means test $500 in

contempt proceeds he received during the 6-month lookback period. The omissions were

corrected on his amended documents.

Debtor filed a separate motion for contempt against Frankie on August 23, 2011, which

was dismissed in November 2011 and, therefore, was pending during the one-year period prior to

5

the date Debtor commenced his bankruptcy case. Debtor did not list the proceeding on his

original SOFA, but did include it on his amended SOFA.

### Tech Notch

In May 2009, Debtor started a business called Tech Notch that provided installation

services for DirecTV. The business was organized as a sole proprietorship. Debtor's son-in-law,

Jermaine Lewis, managed the business and performed all installations. However, Debtor

maintained sole control over the company checkbook. Although Mr. Lewis was paid on a

commission basis he never received compensation other than reimbursement for gas. According

to Debtor, Tech Notch never met the minimum number of installations necessary to receive

payment from DirecTV, although it was entitled to reimbursement for equipment it purchased

and installed.

On March 1, 2010, Debtor withdrew $4,700 from his personal bank account to purchase a

Ford van for Tech Notch. (Plaintiff's exhibit 16, at p.3.) Debtor testified that the van is titled in

the name of Tech Notch and is currently being driven by Mr. Lewis, whose personal vehicle was

wrecked by his son. Debtor did not list the Ford van on his original Schedule B or on his first

amended Schedule B. He did list the van on his second amended Schedule B, filed November 2,

2013.

Tech Notch stopped doing business some time in 2010. Nevertheless, Tech Notch bank

statements show a $300 check paid in July 2012 and debits of $50 and $272.46 in August 2012.

(Plaintiff's exhibit 18, p.4-5.) Debtor could not recall the purpose of the withdrawals but said

they may have been used to pay back bills to Perfect 10, a supplier for DirecTV. Similarly,

Debtor's personal checking account showed a $155.46 check card payment to Perfect 10 in May

6

2012, which Debtor also attributed to payment of an old bill. (Plaintiff's exhibit 22, p.3.)

At trial, Debtor testified that he never invested any money into Tech Notch. At his 2004 examination, Debtor testified that he put about $38,000 into Tech Notch. Debtor's 2009 income tax return did not include a Schedule C for business profit and loss. Debtor's 2010 income tax return included a Schedule C that showed expenses of $14,000. When asked to explain the discrepancies among his trial testimony, his 2004 examination testimony, and his tax returns, Debtor said that the $38,000 figure represented purchases he made for the business rather than a capital contribution. With respect to his taxes, Debtor said he simply relied on his tax preparer to complete his returns correctly after providing her with information about his spending on the business. He testified at trial that he spent the $38,000 for expenses such as gas, insurance, materials, a van, receivers, and tools and that he retained receipts for all purchases. When asked at his 2004 examination what business records he had from Tech Notch, Debtor said: "Nothing but what I purchased."

## Plaintiff and the Smyrna House

Plaintiff's judgment debt arises from her involvement with a townhouse located in Smyrna, Georgia, and owned by Debtor. Debtor owned the house with his former wife, Frankie. According to Plaintiff, Debtor approached her in 2007 asking her to take over the house to prevent Frankie from receiving it in the divorce. Debtor contends Plaintiff approached him about taking over the house because she wanted to move to Georgia and start a business out of the house. Regardless of who initiated the agreement, the general plan was for Plaintiff to take over payments on the house after it was awarded to Debtor in the divorce in 2009. In return, Debtor would cooperate with Plaintiff in her attempts to refinance the house in her name and provide her

with a quitclaim deed.

      Plaintiff contends that she loaned Debtor $98,000 to pay costs associated with ownership of the house, including the mortgage payments, and loaned him additional funds to pay for two attorneys during his divorce. Debtor agrees that Plaintiff paid $19,000 to bring current all past due debts related to the house, made mortgage payments from November 2009 to February 2010, and paid for his divorce attorney. However, he disputes that any those payments were intended as loans. Furthermore, he testified that when the divorce court ordered Frankie to reimburse him for the $19,000 paid to cure various arrears, he offered the money to Plaintiff. Debtor said Plaintiff declined to take the money because he would need it to make repairs to the house.

      Upon conclusion of Debtor's divorce in 2009, Plaintiff began preparing for her move to the Smyrna house by purchasing items necessary to set up a household, such as linens, cookware, and glassware. She moved those items into the house in September 2009. About that time she also added Debtor to her bank account (the "joint account"). According to Plaintiff, Debtor agreed to deposit in the account any proceeds he received from the divorce and she agreed to deposit additional money to be used for the maintenance and repair of the house. Debtor moved into the house[3] to oversee repairs, including a leaky roof, and damage caused by Frankie to the floors and walls. Because Frankie had removed virtually all of the furnishings when she vacated the house, Debtor purchased new furniture. Plaintiff testified that she accompanied Debtor on his shopping trip, during which he spent approximately $20,000 of his divorce proceeds on new furniture.

      Plaintiff contends Debtor made unauthorized withdrawals totaling $60,000 from the joint

---

[3] Prior to the divorce, Debtor had been living with a niece in Dublin, Georgia.

bank account. Although the parties had no written agreement regarding limitations on Debtor's ability to make withdrawals, Plaintiff testified she authorized Debtor to withdraw money for repairs, but only after providing Plaintiff with a receipt for the work performed. Debtor never provided Plaintiff with any receipts. Debtor admits making the withdrawals, but testified that all withdrawals were made with prior notice to and approval by Plaintiff and that all the withdrawals were used to pay for repairs to the roof, floors, balcony, and walls. In addition, Debtor testified that he deposited funds into the joint account totaling $45,000.[4]

Plaintiff traveled from her home in Virginia to Smyrna several times between September 2009 and June 2010. At some point she discovered Debtor had purchased two vans and moved his grandson into the Smyrna house. According to Plaintiff, she warned Debtor that if he failed to discuss such decisions with her then he would have to repay in full all money she had loaned to him, which amounted to $130,000. These revelations further prompted Plaintiff to close the joint account in March 2010 and withdraw the $31,000 balance.

In June 2010, Plaintiff attempted to retrieve her property from the Smyrna house. Plaintiff testified that a physical altercation ensued, with Debtor shoving Plaintiff against the wall, preventing her from packing her property, and calling the police. When the police arrived, they said one of the two would have to leave. So, Plaintiff left the house without her personal

---

[4] Defendant's exhibit 6 consists of statements for the joint account for the first, second, and third quarters of 2009 and for the first quarter of 2010. Defendant's exhibit 6 also includes copies of four checks payable to Debtor: two cashier's checks from Frankie Williams dated August 17, 2009–one for $4,000 and one for $16,000, for a total of $20,000; a cashier's check from Frankie Williams in the amount of $20,000 dated January 21, 2010; and a check from George Creighton Childes, Jr., attorney at law, in the amount of $5,339.95 dated February 19, 2010. The bank statements show a deposit of $20,000 on August 25, 2009, a deposit of $20,000 on January 26, 2010, and a deposit of $5,339.95 on February 22, 2010; the deposits are consistent with the dates and amounts of the four checks.

9

property and never returned out of concern for her safety. She further testified that she wanted

police present at any future attempts to recover her property. The police declined to be present

and instead advised her to take Debtor to court. Plaintiff does not know what became of most of

her property, but Debtor ultimately lost the Smyrna house to foreclosure and currently resides in

Bonaire, Georgia.

Debtor testified that he moved to Bonaire in June 2012 because he could no longer afford

the Smyrna house. Six men, including his son-in-law Joe Miller helped with the move. Debtor

testified he did not know the location of all Plaintiff's property, although some items were

probably boxed up at his house in Bonaire and some pictures were in Mr. Miller's garage. Debtor

claims he did not give away any of Plaintiff's items. Debtor testified only that everything in the

Smyrna house was packed up and placed in a moving van and that he had no use for and did not

want Plaintiff's property. Debtor did not say whether or not Mr. Miller retained the pictures with

Debtor's permission.

Debtor never repaid any money paid to him or on his behalf by Plaintiff and never

provided her with a quitclaim deed. Debtor testified that he could not sign a quitclaim deed

because Plaintiff was unable to refinance the house in her name, even though Debtor cooperated

with her efforts by signing various documents required by the bank.

Plaintiff filed suit against Debtor in Cobb County, Georgia, in 2011. An amended

complaint filed on March 7, 2012, sought recovery of money loaned in the total amount of

$29,737.37; breach of contract and unjust enrichment damages in the total amount of $77,871.56;

and damages for appropriation and conversion of personal property; and attorney fees and

expenses of litigation. (Plaintiff's exhibit 19.) During a bench trial, Plaintiff submitted as

evidence an itemized list she created of personal property she left at the Smyrna house, with a

total value of $11,577.51. (Plaintiff's exhibit 20.) The court entered judgment in favor of

Plaintiff on March 19, 2012. The order did not state the basis for the judgment. It reads in full as

follows:

> The above styled and stated case having been called in its
> order and the issues having been duly tried before the Court
> without a jury and a decision having been duly rendered;
>      IT IS ORDERED AND ADJUDGED that the Plaintiff have
> Judgment against the Defendant(s) Harold Williams
>      AND IT IS FURTHER ORDERED that the Judgment be a
> Final Judgment against said Defendant(s) in the amount of
> $74,400.00 Principal, $ — Interest, $3,500.00 Attorney Fees, and
> $245.00 Cost; Total Amount $78,145.00, with future interest upon
> said principal amount from date of Judgment at the rate per
> O.C.G.A. 7-4-12 per annum.

(Plaintiff's Exhibit 21.)


## Disposition of Debtor's Assets

Prior to starting Tech Notch in 2009, Debtor was unemployed due to disability. He relied

on income from a pension in the amount of about $1,300 per month and on disability payments

in the amount of about $1,900 per month,[5] which he testified covered his housing costs of

approximately $3,000.[6] He further testified that he relied on payments from the divorce to cover

---

[5] When Debtor turned 65 years old he transitioned from disability to social security.

[6] From May 2010 to November 2010, Debtor's monthly mortgage payment on the
Smyrna house was $2,150.90. The mortgage payment did not include taxes and insurance. From
December 2010 to November 2011, the payment was $1,173.23. From December 2011 to March
2012, the payment was $1,222.15. According to his bank records, he made no mortgage payment
in September 2010 or October 2010, but he made two payments in December 2010. Debtor paid
homeowner's insurance in 2011 in the amount of $2,260. (Defendant's exhibit 3.) Debtor
testified that county taxes on the house were approximately $2,200 per year and city taxes were

his other expenses.

In February 2010 Debtor made purchases at Brandsmart for $1,151.84, at Best Buy for

$413.38, and at Georgia Wholesale Retail Furniture for $2,730. (Plaintiff's exhibit 16.) Debtor

testified the purchases were for furniture, including a desk and chair. When he moved to Bonaire

in June 2012, he put the office furniture on the curb along with other personal items that would

not fit in the moving truck. In addition, when he moved he gave away personal property

including lamps, blinds, and a chandelier. He testified he did not know the value of the items. He

did not list these gifts on his original SOFA, but did disclose them on his amended SOFA.

In 2010, Debtor made two cash withdrawals from his bank account: a withdrawal of

$4,600 on February 20, 2010, and a withdrawal of $4,700 on March 1, 2010. (Plaintiff's exhibit

16.) Debtor does not recall how he spent the February withdrawal, although he might have used it

to visit his grandchildren. As discussed above, he used the March withdrawal to purchase a Ford

van for Tech Notch. Also on February 18, 2010, Debtor purchased a GMC van for Jermaine

Lewis for $5,200. (Plaintiff's exhibit 16.) Debtor testified that he bought the van as

compensation for work Mr. Lewis had performed at the Smyrna house. However, Mr. Lewis's

son wrecked the GMC van, so Debtor currently allows Mr. Lewis to drive the Ford van.

In April 19, 2012, Debtor withdrew $2,000 from his bank account. Debtor testified he

used that money to pay the $1,495 deposit on his current residence in Bonaire and for moving

expenses.

## Conclusions of Law

---

approximately $1,800 per year. His homeowner's association fees were $175 per month, and his
utilities cost approximately $300 per month. Thus, between May 2010 and March 2012, Debtor's
monthly housing expenses ranged from approximately $3,146 to $2,169.

The Chapter 7 discharge offers debtors an opportunity to wipe the financial slate clean
and enjoy a fresh start. In exchange for this benefit, debtors are expected to cooperate with the
administration of their case by fully disclosing their financial affairs. Hence, the fresh start
accrues to the honest but unfortunate debtor. To carry out this fresh start policy, the
nondischargeability provisions of the Bankruptcy Code are liberally construed in favor of the
debtor. Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 304 (11th Cir. 1994). To prevail
under either 11 U.S.C. § 727(a) or § 523(a), Plaintiff must prove her case by a preponderance of
the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991); Jennings v.
Maxfield (In re Jennings), 533 F.3d 1333, 1339 (11th Cir. 2008).

### 11 U.S.C. § 727(a)(4)(A)–False Oath in Connection With the Bankruptcy Case

Pursuant to 11 U.S.C. § 727(a)(4)(A), "The court shall grant the debtor a discharge,
unless– ... (4) the debtor knowing and fraudulently, in or in connection with the case– (A) made a
false oath or account[.]" To prove a case under § 727(a)(4)(A), Plaintiff must show Debtor made
a material false oath with fraudulent intent. Swicegood v. Ginn, 924 F.3d 230, 232 (11th Cir.
1991). If Plaintiff "brings forth credible evidence establishing these elements [of false oath], the
burden shifts to the debtor to convince the court not to deny discharge based on the objecting
party's evidence." Phillips v. Epic Aviation (In re Phillips), 476 Fed. Appx. 813, 816 (11th Cir.
2012). For purposes of § 727(a)(4)(A), a false oath includes deliberate omissions from the
debtor's bankruptcy schedules. Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 618 (11th Cir.
1984).

To prove fraudulent intent, the Plaintiff must show actual fraud; constructive fraud is not

13

sufficient. See <u>Miller</u>, 39 F.3d at 306; <u>Royer v. Smith</u> (<u>In re Smith</u>), 278 B.R. 253, 257 (Bankr.

M.D. Ga. 2001) (Walker, J.). However, the Court may infer actual fraud from the circumstances

or the debtor's conduct. <u>Jennings</u>, 533 F.3d at 1339 (citing <u>In re Krehl</u>, 86 F.3d 737, 743 (7th Cir.

1996)). Furthermore, a "series or pattern of errors or omissions may have a cumulative effect

giving rise to an inference of an intent to deceive." <u>Parnes v. Parnes</u> (<u>In re Parnes</u>), 200 B.R. 710,

714 (Bankr. N.D. Ga. 1996) (citations omitted). However, fraudulent intent may not be inferred

when the omissions result from an honest mistake or an oversight. <u>Melarango v. Ciotti</u> (<u>In re

Ciotti</u>), 448 B.R. 694, 704 (Bankr. W.D. Pa. 2011); <u>see also</u> <u>Bozeman v. Sullivan</u> (<u>In re

Sullivan</u>), 492 B.R. 348, 353 (Bankr. M.D. Ga. 2013) (Walker, J.) (no false oath where omissions

were the result of carelessness and poor legal representation).

A false oath is material when "it bears a relationship to the bankrupt's business

transactions or estate, or concerns the discovery of assets, business dealings, or the existence and

disposition of his property." <u>Chalik,</u> 748 F.2d at 618. The value or lack of value of omitted assets

has no bearing on materiality, although it may serve as evidence of fraudulent intent. <u>See</u> <u>id.</u>;

<u>Parnes</u>, 200 B.R. at 714.

Plaintiff in this case identified multiple omissions from Debtor's schedules, most of

which were remedied by amendment more than eight months after the meeting of creditors and

more than four months after Plaintiff initiated this adversary proceeding. The omissions are as

follows:

<u>Statement of Financial Affairs</u>

- *Line 2, income other than from employment or operation of business*: Debtor failed to list
  alimony or contempt proceeds he received from Frankie between 2010 and 2012; Debtor
  failed to list the worker's compensation award he received in December 2010; Debtor failed

14

to list the proceeds he received from the sale of the South Anthony Boulevard house in January 2010.[7]

- *Line 4, suits and administrative proceedings*: Debtor failed to list a contempt action that was pending in November 2011, within one year of the petition date.

- *Line 7, gifts*: Debtor failed to list personal property he gave away in connection with his move from Smyrna to Bonaire.

- *Line 9, payments related to debt counseling or bankruptcy*: Debtor failed to list a payment of $3,500 made to the Mitchell Law Group in April 2012 for consultation about bankruptcy and other legal services.

- *Line 10, other transfers*: Debtor failed to list the August 2011 sale of the Collins Avenue property.

Schedule A

- Debtor failed to list his contingent interest in the West Elm and Van Wert properties.[8]

Schedule B

- *Line 2, checking, savings, or other financial accounts*: Debtor disclosed only one of his four bank accounts.

---

[7] It is not clear Debtor was required to disclose his receipt of the proceeds from the sale of the South Anthony Boulevard house. Line 1 of the SOFA requires a debtor to disclose income from employment or operation of a business received "during the two years immediately preceding this calendar year." Official Form 7, Statement of Financial Affairs, line 1 (emphasis added). By contrast, line 2 of the SOFA requires a debtor to disclose nonemployment and nonbusiness income received "during the two years immediately preceding the commencement of this case." Id., line 2 (emphasis added). Debtor received the sale proceeds during the two calendar years preceding the petition date, but not during the two-year period (i.e., 730 days) preceding the petition date. Plaintiff argues that line 2, by implication, includes the two calendar years preceding the petition date. Because the Court finds certain of Debtor's other omissions are sufficient to deny his discharge, it need not determine the extent of the lookback period in line 2 of the SOFA.

[8] The Court is not persuaded Debtor has any interest or potential interest in these properties that he was required to disclose. Debtor's interest in the properties is dependent on his ex-wife's interest in the properties. However, the court granting their divorce could not determine whether Frankie had any interest in the properties.

- *Line 5, books, pictures, etc.*: Debtor failed to list compact discs and pictures.

- *Line 7, furs and jewelry*: Debtor failed to list a ring and watch.[9]

- *Line 12, interests in retirement plans*: Debtor failed to list his Teamsters pension.

- *Line 17, alimony and support*: Debtor failed to list payments due under a divorce-related contempt order.

- *Line 25, vehicles*: Debtor failed to list a Ford van purchased for use in the operations of Tech Notch. It was not listed in the original schedules or in the first amended schedules. It was listed in the second amended schedules filed more than a month after the trial.

Schedule I

- Debtor failed to list $500 he expected to receive from the divorce-related contempt award.

Means Test

- Debtor failed to list $500 he received from the divorce-related contempt award in the six months prior to the month he filed his bankruptcy petition.

    Debtor generally attributed the omissions to forgetfulness and ignorance. In some cases, he forgot to disclose the information, in some cases he did not realize he had to disclose the information, and in some cases, he does not know why the information was omitted. While these explanations may be satisfactory for some of the smaller items identified by Plaintiff, they are wholly inadequate to explain the absence from his schedules of any financial information related to his divorce, his worker's compensation claim, and the Tech Notch van. See Caldwell v. Horton (In re Horton), 252 B.R. 245, 247 (Bankr. S.D. Ga. 2000) (Walker, J.) ("Property forgotten for its inconsequential value is easily distinguishable from property purposefully omitted.")

---

[9] Debtor listed a watch on his amended Schedule B. However, at trial he testified that he has never owned a watch and does not know why it was included in the amendment.

16

Although Debtor's divorce from Frankie was finalized in 2009, the financial implications of the divorce are ongoing and are of a nature not easily overlooked or forgotten. They include receipt of alimony, sale of real estate, and multiple actions for contempt *initiated by Debtor*. Similarly, Debtor's worker's compensation claim significantly affected his life in that it rendered him unable to continue working as a truck driver. It is simply not credible that the income and transactions relating to these two major and relatively recent life events were omitted as the result of carelessness or forgetfulness. In fact, Debtor offered an alternative explanation for their omission. He testified that some unspecified person told him the worker's compensation proceeds and the proceeds from his contempt action were not income. Regardless of the truth of this explanation, it is unsatisfactory for a debtor to rely on the advice of anyone other than his bankruptcy counsel in determining what constitutes income for purposes of completing the bankruptcy forms.

With respect to the Ford van, Debtor explained the van is titled in Tech Notch, and he omitted it because it is not his property. This explanation is unsatisfactory in light of the fact that Debtor owned Tech Notch as a sole proprietor, that Tech Notch ceased operations approximately two years prior to the bankruptcy filing, and that the van is currently used by Debtor's son-in-law with Debtor's permission. Debtor cannot disclaim ownership of the van merely because it is titled in the trade name of his sole proprietorship. See Dowis v. Watson, 289 S.E.2d 558, 559 (Ga. Ct. App. 1982) ("An unincorporated sole proprietorship is not a separate legal entity from the proprietor ....").

The Court also notes that Debtor's demeanor as he gave testimony may best be described as recalcitrant and evasive; he frequently offered incomplete, incoherent, and unresponsive

17

answers on cross examination. In other words, he failed to demonstrate the spirit of cooperation

and candor necessary to obtain a discharge.

Based on the nature of the omissions from Debtor's schedules and his continued

obfuscation of the facts during the trial, the Court concludes Debtor omitted information related

to his divorce, his worker's compensation claim, and Tech Notch with fraudulent intent.

Furthermore, the omissions are material because they concern the existence or disposition of his

property. Debtor failed to offer any credible or sufficient explanation for the omissions. Although

Debtor amended his schedules, the omissions were of such a magnitude that the amendments do

nothing to mitigate the Court's conclusion that Debtor acted with fraudulent intent. Therefore,

Plaintiff has met her burden under § 727(a)(4)(A), and Debtor's discharge will be denied.


### *11 U.S.C. § 727(a)(2)(A)–fraudulent transfer of property*

The Court may deny Debtor's discharge if "the debtor with intent to hinder, delay, or

defraud a creditor ... has transferred, removed, destroyed, mutilated, or concealed, or has

permitted to be transferred, removed, destroyed, mutilated, or concealed– (A) property of the

debtor, within one year before the date of the filing of the petition[.]" 11 U.S.C. § 727(a)(2)(A).

To prevail, Plaintiff must prove (1) a transfer, (2) of Debtor's property, (3) made within one year

prior to the petition date, and (4) made with fraudulent intent. As with false oath, this provision

requires a showing of actual fraud rather than constructive fraud. Miller, 39 F.3d at 306. Such

fraudulent intent may be inferred from the circumstances or from the debtor's conduct. Jennings,

533 F.3d at 1339. In analyzing the debtor's intent, the Court may consider badges of fraud,

including:

18

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between
the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both
before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of
transactions or course of conduct after the incurring of debt, onset
of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of the events and transactions under
inquiry.

Bank of Dawson v. Cutts (In re Cutts), 233 B.R. 563, 570 (Bankr. M.D. Ga. 1999) (Walker, J.)

(citations omitted).

Debtor concedes the first three elements of a fraudulent transfer: he gave away his

personal items, including lamps, blinds, and a chandelier, at the time of his move from Smyra to

Bonaire in June 2012, only a few months before the petition date. He also concedes that he left

office furniture on the curb to be picked up by anyone. The question, then, is whether he made

the transfers with fraudulent intent. The only badge of fraud present in these circumstances is the

lack of consideration for the transfers. However, the gifts were made in the context of Debtor

downsizing in anticipation of moving to a smaller residence. Based on these facts, the Court

cannot conclude Debtor transferred property with fraudulent intent. Therefore, Plaintiff has failed

to prove her case under § 727(a)(2)(A).


### 11 U.S.C. § 727(a)(5)–failure to satisfactorily explain loss of assets

The Court may deny Debtor's discharge if "the debtor has failed to explain

satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities[.]" 11

U.S.C. § 727(a)(5). The initial burden of proof falls on the party objecting to discharge; the

19

burden then "shifts to the debtor to explain satisfactorily the loss." <u>Chalik</u>, 748 F.2d at 619. "To

be satisfactory, 'an explanation' must convince the judge. ... Vague and indefinite explanations

of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." <u>Id.</u>

(citations omitted).

At the trial, Plaintiff argued that Debtor failed to adequately show where all his assets had

gone, especially the following amounts of money he received between 2009 and 2012:

- $66,000 received in June 2009 as property settlement in his divorce;

- $24,000 in alimony payments received from 2009 to 2011;

- $50,000 received in January 2010 from the sale of the South Anthony Boulevard house;

- $8,128.90 received in August 2011 from the sale of the Collins Avenue property;

- $21,000 received in December 2010 in a worker's compensation settlement; and

- $13,500 received in payments from 2010 to 2012 for a contempt judgment resulting from the
  sale of the Crestwood Drive property.

In total Debtor received approximately $183,000 over a three-year period. Debtor

contends he spent $38,000 for the operations of Tech Notch and deposited $45,000 into the joint

bank account. Furthermore, Plaintiff's testimony indicates Debtor spent approximately $20,000

of the divorce proceeds on furniture after Frankie vacated the Smyrna house. Debtor contends the

remaining $80,000 was used for living expenses. Although Debtor receives pension and Social

Security income, that income was primarily used to cover his housing costs when he was living

in the Smyrna house. Based on these facts, the Court finds Debtor has reasonably and

satisfactorily accounted for the disposition of income related to his divorce and worker's

compensation claim.

20

Plaintiff also questioned Debtor's disposition of several large cash withdrawals: $4,600 in February 2010; $4,700 in March 2010, and $2,000 in April 2012. Debtor testified he spent the $4,700 withdrawal to purchase a van for Tech Notch, and he spent the $2,000 to cover the expenses of moving to Bonaire. He could not recall any specific purpose for the third withdrawal other than possible travel to visit his grandchildren. The Court finds these explanations to be satisfactory and to be supported by the evidence. Because Debtor has satisfactorily explained loss of assets, Plaintiff has failed to prove her case under § 727(a)(5).

### 11 U.S.C. § 727(a)(3)–failure to preserve financial records

The Court may deny a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information ... from which the debtor's financial condition or business transactions might be ascertained[.]" 11 U.S.C. § 727(a)(3). Factors relevant to this inquiry include: "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice." Milam v. Wilson (In re Wilson), 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983); see also Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992).

At the trial, Plaintiff argued that Debtor kept no business records for Tech Notch and that his tax returns as they related to Tech Notch were incomplete or inadequate. Plaintiff's assertions appear to be true to some extent. However, the state of Debtor's business records seems driven by his complete inability to understand rudimentary business concepts. For example, he did not understand that a sole proprietorship has no separate legal existence apart from its owner. He did

21

not understand that a contract he executed with a DirecTV supplier was a business record. He did

not understand the purpose and significance of filing a Schedule C with his tax returns. His

testimony indicated his primary method of recordkeeping was to retain receipts for all purchases

he made on behalf of Tech Notch, and he testified that he still has those receipts, although he

apparently never produced them to Plaintiff.

In these circumstances, the Court finds no basis to conclude Debtor concealed, destroyed,

or falsified financial records. While he did not keep detailed business records, the Court

concludes his records are adequate for an unsophisticated debtor whose short-lived business

never generated any profits. Therefore, Plaintiff has failed to prove a case under § 727(a)(3).


### 11 U.S.C. § 523(a)(4)–fiduciary fraud or defalcation, embezzlement, or larceny

The Court may deny discharge of a particular debt if the debt results from Debtor's "fraud

or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" Fiduciary fraud

or defalcation requires the existence of an express trust that pre-exists the act resulting in a debt.

Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 816 (11th Cir. 2006); Quaif

v. Johnson, 4 F.3d 950, 953 (11th Cir. 1993). In addition, defalcation requires an intentional

wrong, which includes conscious disregard of "'a substantial and unjustifiable risk' that [the

debtor's] conduct will turn out to violate a fiduciary duty." Bullock v. BankChampaign, – U.S. –,

133 S. Ct. 1754, 1759 (2013) (quoting ALI Model Penal code § 2.02(2)(c), p. 226 (1985)).

Embezzlement requires a showing of "an appropriation by the debtor of [property] lawfully in the

debtor's possession, for the debtor's use or benefit, with fraudulent intent." Wilson Family

Foods, Inc. v. Brown (In re Brown), 457 B.R. 919, 926 (Bankr. M.D. Ga. 2011) (emphasis

added). Finally, larceny requires a showing of an <u>unlawful</u> taking of property by the debtor "with

the intent to convert it or to permanently deprive the owner of it." <u>Id.</u> (quotation marks and

citations omitted).

At the trial, Plaintiff argued that she entrusted her household goods to Debtor and he

prevented her from retrieving them, that Debtor took control of the property, and the Debtor took

$60,000 from the joint bank account without her permission. However, none of these facts

amount to fiduciary defalcation, embezzlement, or larceny.

With respect to fraud or defalcation in a fiduciary capacity, Plaintiff does not show or

even allege the existence of an express trust, which is a threshold element of the claim.

Therefore, she has failed to prove a case for fiduciary fraud.

Turning to embezzlement and larceny, the two acts are primarily distinguishable based on

whether or not the debtor was in lawful possession of the property at issue. In this case, Plaintiff

willingly placed her personal property in a house owned and occupied by Debtor. Plaintiff

contends Debtor later prevented her from removing her property, at which point his possession of

the property arguably transformed from lawful to unlawful. While Plaintiff has shown Debtor to

be in possession of her property, she has failed to demonstrate evidence that he intended to

convert it to his own use or to permanently deprive her of it. He did temporarily prevent her from

taking her property in the midst of a confrontation over money. But there is no evidence his

efforts were ongoing. Plaintiff's personal concerns for her safety reflect her state of mind but do

not serve as evidence of Debtor's intent to deprive her of property. Debtor testified that he

neither wanted Plaintiff's property nor had any use for it. He did not destroy or otherwise dispose

of the property, although he may have lost track of some of it.

23

As to the bank account, Plaintiff testified that there were no written restrictions on

Debtor's access. Debtor testified that he deposited $45,000 into the account, that he never made a

withdrawal without first alerting Plaintiff, and that he used all withdrawals to pay for repairs to

the Smyrna house, which were expected to benefit Plaintiff. The evidence points to an intent to

help Plaintiff, not harm her. In these circumstances, Plaintiff cannot show embezzlement or

larceny of her personal property or funds in the joint account. Therefore, Plaintiff has failed to

prove her case under § 523(a)(4).


### 11 U.S.C. § 523(a)(6)–willful and malicious injury

The Court may deny discharge of a particular debt if the debt results from "willful and

malicious injury by the debtor to another entity or to the property of another entity[.]" A willful

act is one that is intended to cause injury or from which injury is substantially certain to result.

Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012) (citing Kawaauhau

v. Geiger, 523 U.S. 57, 61-62, 118 S. Ct. 974, 977 (1998)). A malicious act is one that is

"wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-

will." Jennings, 670 F.3d at 1334 (quotation marks and citations omitted).

At the trial, Plaintiff argued Debtor converted Plaintiff's property to his own use and

prevented her from taking possession of it. The evidence indicates Plaintiff placed substantial

personal property in the Smyra house in the belief that she would eventually become the owner

of the house. The evidence further indicates that after relations between the parties soured,

Plaintiff never retrieved her property out of fears for her personal safety. Rather than attempting

to recover her property, she opted to initiate civil litigation to recover the value of the property.

When Debtor moved out of the Smyrna house, he testified that he did not want and had no use

for Plaintiff's property. He could not account for all Plaintiff's property, but acknowledged some

items might be at his current residence and some items were at the home of his son-in-law. The

Court is persuaded that Debtor simply did not care about Plaintiff's property or what became of

it. His actions with respect to her property were negligent and thoughtless, but they do not rise to

the level of willfulness and malice. Therefore, Plaintiff has failed to prove her case under

§ 523(a)(6).

## Conclusion

Plaintiff has shown Debtor omitted from his schedules information about his divorce, his

worker's compensation claim, and his Tech Notch business with fraudulent intent and has shown

the omissions were material. Under 11 U.S.C. § 727(a)(4)(A) the omissions constitute a false

oath made in connection with Debtor's bankruptcy case. Therefore, the Court will enter judgment

for Plaintiff and deny Debtor a discharge.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT